DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| United States of America, | ) | CASE NO.  1:06 CR 269 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | MEMORANDUM OPINION |
| v. | ) | ANALYZING THE SENTENCING |
|  | ) | FACTORS SET FORTH IN 18 U.S.C. |
| Terrence W. Gasper | ) | SECTION 3553(a) |
|  | ) |  |
| Defendant. | ) |  |

I. Introduction

The present sentencing regime in Federal District Courts requires that the sentencing judge calculate what is now called the advisory sentencing guideline range.  That range consists of two components.  First, the judge is required to compute the offense level for the criminal conduct represented by the conviction.  Next, the judge is required to determine the criminal history category for the defendant.  After those two calculations are complete, the court is directed to a sentencing grid which sets forth a combination of 43 offense levels and six criminal history categories.  In this case, the presentence report begins with a base offense level of 10 for the crime for which the defendant stands convicted.  As the offense involved more than one bribe, there is an increase of two levels pursuant to United States Sentencing Guideline § 2C.1(b)(1).

An additional 22 levels are added in this case under the provisions of United States Sentencing Guidelines under § 2C1.1(b)(2)(A) which states that if the value of the payment, the benefit received, or to be received in return for the payment (bribe), or the loss to the

(1:06 CR 269)

government for the offense... exceeded $5,000, increase by the number of levels from the table in

§ 2B1.1 corresponding to that amount.  In this case, as the amount benefitted by the Dealer,

Brokers, and Marketer was between $25 and $42.5 million and pursuant to United States

Sentencing Guideline § 2B1.1(b)(1)(L), the offense level is increased by 22 levels.  As a

consequence, the adjusted offense level before any reductions is 34.  The defendant is entitled to

a reduction of three levels for acceptance responsibility pursuant to the provisions of United

States Sentencing Guideline § 3E1.1A and § 3E1.1(b).

   When the Congress of the United States adopted the sentencing guidelines, it provided an

incentive to defendants to cooperate with the government in the prosecution of other alleged

criminals.  However, the Congress provided that no consideration would be given to a defendant

for cooperation with the government in the calculation of the offense level unless the

government, i.e, the prosecution, recommended the sentencing judge engage in a downward

departure for "substantial assistance".  Once such a recommendation is made by the prosecution,

the sentencing guidelines provide that  it is for the sentencing judge to determine whether to

grant a downward departure for "substantial assistance", and if so, in what amount.  As to the

defendant Terrence Gasper, the government has recommended a downward departure of four

levels for substantial assistance.  The substantial assistance by the defendant included his lengthy

testimony in the case of United States v. Lewis and O'Neil, Case No. 1:06 CR 291, as well as his

cooperation in the prosecution of Clarke Blizzard, Case No. 1:07 CR 59.

   The Court presided over the trial of United States v. Lewis and O'Neil, Case No. 1:06 CR

291, and during which the defendant provided extensive testimony in support of the

2

(1:06 CR 269)

government's case.  The defendant's testimony was supported by many items of documentary evidence.  Nothwithstanding the acquittal of Lewis and O'Neil, the Court found the testimony of the defendant to be forthright and credible.  As a consequence, the Court grants the government's motion for a downward departure for "substantial assistance".  The government has recommended a downward departure of four levels, but in the Court's view, the defendant is entitled to a downward departure of six levels.

The resulting total offense level is 25, and with a criminal history category I, the advisory sentencing guideline range is 57 to 71 months.

The next issue confronting the Court, after it determines the advisory guideline sentencing range, is to consider the question of either an upward or downward variance, given the teachings of *Booker*.  The Court concluded that there was no basis for a variance and after giving the defendant the opportunity to engage in allocution, sentenced the defendant to a term of imprisonment of 64 months and a period of supervised release for three years, a special assessment of $100 and a fine in the sum of $60,405.00 in lieu of an order of restitution.

The Court's sentencing analysis follows.

## II.  The Analysis Required by 18 U.S.C. § 3553(a)

The Court sets forth its analysis of the sentencing factors required by *Booker* and the statutory guidance provided by 18 U.S.C. §3553(a) as follows:

**(a)  Factors to be considered in imposing a sentence.**

3

(1:06 CR 269)

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider -

**(1)  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The defendant entered a plea of guilty on June 7, 2006, to a single-count information charging a violation of 18 U.S.C. § 1962(c), i.e, Racketeer Influenced and Corrupt Organizations Act.

The written plea agreement contained an extensive factual basis describing the defendant's criminal conduct.  The factual basis follows.

> 1.  The parties hereby further agree and stipulate that the following facts would have been established beyond a reasonable doubt at a trial in this matter.  The parties also agree that these are not the only facts that would have been established at a trial:
>
> 2.  Beginning in or about 1912, the Ohio Bureau of Workers' Compensation ("OBWC") began assisting Ohio-based employers and employees to cover expenses related to workplace injuries by providing medical and compensation benefits for work-related injuries, diseases and deaths.  Although its main office is located in Columbus, Ohio, the OBWC has 16 customer service offices located across the state of Ohio.  At all times relevant to the offenses charged in the Information, the OBWC had assets which averaged 19 billion dollars and was one of the largest state-fund workers' compensation bureaus in the United States.  The assets were under the management and control of the Chief Financial Officer and the employees of the Investment Department.  The overall operation of the OBWC involved and affected interstate and foreign commerce as did the management and execution of matters regarding its financial investments.
>
> 3.  The defendant, TERRENCE W. GASPER ("defendant" or "GASPER"), was at all time times relevant to the allegations in the

4

(1:06 CR 269)

Information a public official who held the position of Chief
Financial Officer ("CFO") of the OBWC for the state of Ohio.  In
his official capacity, TERRENCE W. GASPER was in a position
to exert both formal and informal influence over decisions
regarding all financial matters related to the OBWC, including but
not limited to, those regarding the selection, retention and funding
of investments, investment or money managers and advisors as
well as brokerage firms which administered OBWC's investment
portfolio.  TERRENCE W. GASPER owed a duty of honest
services and fair dealing to the Ohio Bureau of Workers'
Compensation and the citizens of the State of Ohio.

4.  During his tenure as CFO of the OBWC, TERRENCE W.
GASPER oversaw a maximum staff of 210 employees in
accounting, actuarial, investment, facilities management and risk
insurance departments within the Finance Division of the OBWC.

5.  At all times relevant to the offenses charged in the Information,
Broker #1 was a licensed broker or security salesperson licensed
by the State of Ohio's Department of Commerce, Division of
Securities.

6.  At all times relevant to the offenses charged in the Information,
Broker #2 was a licensed broker or security salesperson licensed
by the State of Ohio's Department of Commerce, Division of
Securities.

7.  At all times relevant to the offenses charged, Broker #1 and
Broker #2 were employed by the same brokerage security firms.

8.  At all times relevant to the offenses charged in the Information,
Dealer #1 was a coin dealer who specialized in the purchase and
sale of rare coins and related numismatic materials.

9.  At all times relevant to the offenses charged in the Information,
Marketer #1 was a marketer or salesperson of securities associated
with various business in which the OBWC invested in excess of
one million dollars in state funds.

10.  Beginning in or about 1998 and continuing up until October 6,
2004, TERRENCE W. GASPER, the Chief Financial Officer of
the OBWC, willfully participated with others associated with

5

(1:06 CR 269)

OBWC money managers, investment advisors, brokers, dealers
and other contractors or vendors doing and seeking to do business
with the OBWC, including, but not limited to, Broker #1, Broker
#2, Dealer #1 and Marketer #1, in conducing the affairs of the
OBWC through a pattern of racketeering activity.

**<u>Condominium Scheme</u>**

11.  In or about 1998, Broker #1, Broker #2 and TERRENCE W.
GASPER agreed that Broker #1 and Broker #2 would provide
TERRENCE W. GASPER with a condominium, Unit E-21, Coral
Harbor, and deeded boat slip #63, located in Islamorada, Florida,
in large part, in return for favorable consideration from
TERRENCE W. GASPER with respect to OBWC investment
business and to maintain existing investment OBWC business
which affected interstate and foreign commerce.

12.  In or about November 5, 1998 through November 9, 1998,
TERRENCE W. GASPER visited Islamorada, Florida where he
and his then girlfriend met with a real estate agent referred to him
by Dealer #1, viewed condominiums available for purchase and
entered into a binding and assignable contract to purchase Unit E-
21 and boat slip #63 at the Coral Harbor Club Condominium
complex in Islamorada, Florida for $345,000.

13.  TERRENCE W. GASPER gave the real estate agent a $500
personal check as a good faith down payment on Unit E-21 and
boat slip #63.  TERRENCE W. GASPER, however, never had any
intention of actually purchasing Unit E-21 and boat slip #63 with
his own money.

14.  On or about November 9, 1998, TERRENCE W. GASPER
sent a letter by facsimile from his office at the OBWC in
Columbus, Ohio to the real estate agent in Islamorada, Florida
extending his acceptance of the bid to purchase Unit E-21 and boat
slip #63.

15.  On or about November 12, 1998, Broker #1 contacted the real
estate agent representing TERRENCE W. GASPER and informed
that person that he was TERRENCE W. GASPER's partner.

6

(1:06 CR 269)

16.  On or about November 16, 1998, TERRENCE W. GASPER's contract to purchase Unit E-21 and boat slip #63 was assigned to Broker #1 and Broker #2, who thereafter jointly entered into a contract to purchase Unit #21 and boat slip #63 for the same price, $345,000, negotiated by TERRENCE W. GASPER.

17.  Broker #1 and Broker #2 each placed a $35,000 good faith down payment on Unit E-21, for a total of $70,000.

18.  In order to complete the purchase of Unit E-21 and boat slip #63, TERRENCE W. GASPER, Broker #1 and Broker #2 used and caused to be used both the mail and interstate wire services.

19.  On or about January 4, 1999, Broker #1 and Broker #2 closed on the purchase of Unit E-21 and boat slip #63 and became the rightful owners for a total purchase price of $345,000.

20.  With the permission of Broker #1 and Broker #2, beginning as early as February 11, 1999 and continuing throughout his employment with the OBWC which ended in October, 2004, TERRENCE W. GASPER stayed at the condominium and treated it as if it were his own.  Additionally, TERRENCE W. GASPER permitted others, including his girlfriend, her family members and her veterinarian to use the condominium free of charge.

21.  Occasionally, TERRENCE W. GASPER would make a token rental payment to Broker #1 in order to make it appear that his stays at Unit E-21 were legitimate.

22.  TERRENCE W. GASPER did not report his stays at Unit E-21 on his mandatory annual Ohio Ethical Disclosure forms filed for the years 1999 through 2004.

23.  At all times relevant to the charges in the Information, Broker #1 paid the mortgage and all condominium association fees related to Unit E-21 and boat slip #63 jointly on behalf of himself and Broker #2.

24.  At all times relevant to the charges in the Information, Broker #1 wrote checks payable to those close to TERRENCE W. GASPER, including a July 10, 2001 check to TERRENCE W.

(1:06 CR 269)

GASPER's then girlfriend with "consulting" written in the memo line.

25.  The parties agree that the benefit to Brokers #1 and #2, which was reasonably foreseeable to TERRENCE W. GASPER based upon his participation in the Islamorado Condominium scheme, was in excess of 2.5 million dollars and not more than 7 million dollars.

**Check Payment Scheme**

26.  In or about October 2001, TERRENCE W. GASPER and Marketer #1 agreed that Marketer #1 would either directly or indirectly provide things of value to TERRENCE W. GASPER in return for favorable consideration from TERRENCE W. GASPER with respect to obtaining and maintaining OBWC investment business, which affected interstate and foreign commerce.

27.  From in or about April 2002 through in or about September 2004, the exact dates being unknown and while TERRENCE W. GASPER was employed as Chief Financial Officer of the OBWC and in a position to exert control over investment decisions, Marketer #1 issued checks for the benefit of TERRENCE W. GASPER, to TERRENCE W. GASPER and those personally close to him, including his girlfriend, and children of TERRENCE W. GASPER and his girlfriend, for a total of $23,405.  Included among the checks written by Marketer #1 to or for the benefit of TERRENCE W. GASPER was one for $9,005 for "Fall '04 Tuition" made payable to the college that TERRENCE W. GASPER's son was attending.

28.  Although these checks were written to others, TERRENCE W. GASPER would sometimes deposit the checks into his own bank account.  Other times, the person to whom the check was written would deposit the check into his or her own account and make the fund available to TERRENCE W. GASPER.  At all times, the checks were intended to and did provide funds to TERRENCE W. GASPER in return for official acts he performed while CFO.  In exchange for the checks and other things of value, TERRENCE W. GASPER permitted businesses represented by Marketer #1 to retain and obtain OBWC investment business in exchange for the

8

(1:06 CR 269)

payments by check, meals and entertainment for TERRENCE W. GASPER and those personally close to TERRENCE W. GASPER.

29.  TERRENCE W. GASPER did not report any of the things of value provided to him either directly or indirectly by Marketer #1 on his mandatory annual Ohio Ethical Disclosure forms filed for the years 1999 through 2004.

30.  The parties agree that the benefit to Marketer #1, which was reasonably foreseeable to TERRENCE W. GASPER based upon his participation in the above-described scheme, was in excess of 7 million dollars and not more than 20 million dollars.

**Coin Scheme**

31.  At all times relevant to the offenses charged in the Information, Dealer #1 was a coin dealer who specialized in the purchase and sale of rare coins and related numismatic materials.

32.  On or about March 23, 1998, the OBWC approved Dealer #1 as an investment fund or money manager for an award of 25 million dollars.

33.  On or about March 31, 1998, Dealer #1 received 25 million dollars from OBWC which the dealer invested in a fund called Capital Coin I.

34.  On or about March 31, 2001, TERRENCE W. GASPER, his then girlfriend and Dealer #1 met in a Columbus, Ohio area restaurant where Dealer #1 had TERRENCE W. GASPER's girlfriend execute documents making it appear that she was making a $25,000 investment in an entity known to the U.S. Attorney.

35.  Prior to the meeting on March 31, 2001 described above, Dealer #1 and TERRENCE W. GASPER agreed that TERRENCE W. GASPER's girlfriend would execute investment documents in her name although Dealer #1 and TERRENCE W. GASPER knew full well that the $25,000 investment was intended to benefit TERRENCE W. GASPER and that neither TERRENCE W. GASPER nor his girlfriend were expected to produce the required $25,000 because Dealer #1 would and did make the investment on

9

(1:06 CR 269)

    behalf and for the benefit of TERRENCE W. GASPER in exchange for his official influence.

    36.  On or about April 26, 2001, Dealer #1 submitted a proposal to the OBWC for a second additional 25 million dollar investment in a coin fund later known as Capital Coin II.

    37.  During the course of the scheme, TERRENCE W. GASPER caused, along with others, the OBWC to approve two 25 million dollar investments in Capital Coin funds in exchange for the $25,000 investment made in the name of TERRENCE W. GASPER's girlfriend along with other things of value provided to TERRENCE W. GASPER directly and indirectly.

    38.  On or about July 30, 2001, the OBWC authorized the transfer of the second 25 million to Capital Coin II.

    39.  TERRENCE W. GASPER did not report the $25,000 investment made in his then girlfriend's name or any of the other things of value provided to him either directly or indirectly by Dealer #1 on his mandatory annual Ohio Ethical Disclosure forms filed for the years 1999 through 2004.

    40.  The parties agree that the benefit to Dealer #1 as a result of the Capital Coin fund investments on behalf of the OBWC, which was reasonably foreseeable to TERRENCE W. GASPER based upon his participation in the above-described scheme, was approximately 13 million dollars plus additional profits of approximately 2.5 million dollars.

The defendant's acceptance of responsibility is set forth in paragraph 35 of the presentence report as follows:

    The defendant signed the following typed statement:

    "When I realized that actions that I had taken were going to lead to some sort of consequence I initially rationalized my conduct.  I convinced myself that my actions fell into some gray area that, although unethical, was really not that serious.  That is certainly no longer the case.

(1:06 CR 269)

> "I have come to realize that in my position as Chief Financial
> Officer of the Ohio Bureau of Workers Compensation I should
> have conducted myself in a manner that left no doubt as to my
> ethics.  Instead I violated the trust that the people of the state of
> Ohio placed in me, shaming my family, my friends and myself.
>
> "Given the poor choices that I have made, the laws that I have
> broken and the crimes that I have committed I am left with few
> opportunities to make amends.  Although few, I have attempted to
> take full advantage of those opportunities so that to illustrate, by
> deed, my remorse and full acceptance of responsibility.  I have
> voluntarily pleaded to an information, waiving an indictment.  I
> have done all in my power to fully divulge my criminal conduct
> and any other questionable conduct that I was aware of so as to
> assist law enforcement.
>
> "I respect the job the Court must do in this case and have done all
> in my power to streamline this process.  I will do all in my power
> to rehabilitate the personal reputation that I destroyed and, once
> again, contribute to my community in a meaningful manner." [sic]

The defendant is 60 years old having been born in Cleveland, Ohio, to parents who remained married until the death of the defendant's father at the age of 74.  The defendant's mother died in 2006 at the age of 87.  The defendant was married in 1976 and the marriage resulted in the birth of two adult children.  The defendant's marriage ended in divorce in 1993.

The defendant graduated from St. Ignatius High School in Cleveland on June 8, 1965, and from John Carroll University in 1969, with a Bachelor of Science in Economics, Summa Cum Laude.

The defendant has an extensive employment record.  From 1971 to 1976, he was a trust investment officer for the National City Bank in Cleveland, Ohio.  From 1976 to 1980, he was a pension investment officer for Reliance Electrical Corporation in Cleveland, Ohio.  Beginning in December of 1980 until his employment with the Ohio Bureau of Workers' Compensation, he

11

(1:06 CR 269)

served as an assistant treasurer for Borden, Inc. in Columbus, Ohio.  On September 8, 1995, he

began working for the Ohio Bureau of Workers' Compensation in Columbus, Ohio as its chief

financial officer and he remained in that position until October 8, 2004 when he was terminated.

The defendant is under the care of Dr. David Neiger, his primary care physician.  In

March of 2004, he suffered a stroke and has been taking medications since that time to prevent

additional strokes and heart attacks.  He now takes Metoprolol Tartrate for blood pressure;

Lipitor for cholesterol; Wellbutrin, an antidepressant; Citalopram (Celexa), an antidepressant;

aspirin, a blood thinner; Ambien, a sleep aid; multiple vitamins; and Citrina.

The defendant reports that he never been under the care of a mental health professional.

However, he does indicate depression which he attributes to his stroke, his loss of his

employment with the Ohio Bureau of Workers' Compensation, his mother's death after caring

for her for 15 years and his current legal situation.

The defendant is a social drinker who occasionally engages in binge drinking and reports

that his children have displayed active concern about his alcohol consumption since his March,

2004 stroke.

> **(2)   The Need for the Sentence Imposed**
>
> > **(A) to reflect the seriousness of the offense, to promote respect
> > for the law, and to provide just punishment for the offense;**

In presiding over this prosecution and the jury trial of United States v. Lewis and O'Neil,

Case No. 1:06 CR 291, the following information was developed:

1. Beginning in or about 1912, the Ohio Bureau of Workers' Compensation

    ("OBWC") began assisting Ohio-based employers and employees to cover

12

(1:06 CR 269)

expenses related to workplace injuries by providing medical and

compensation benefits for work-related injuries, diseases and deaths.

2.      At all times relevant to the charges, OBWC had assets which averaged 19

billion dollars and was one of the largest exclusive state-fund workers'

compensation bureaus in the United States.  The assets of the OBWC were

under the management and control of the Chief Financial Officer ("CFO")

and the employees of the Investment Department.  The overall operation

of the OBWC involved and affected interstate commerce as did the

management and execution of matters regarding its financial investments.

3.      Terrence W. Gasper was a public official who held the position of CFO of

the OBWC and was in a position to exert both formal and informal

influence over decisions regarding all financial matters related to the

OBWC, including but not limited to, those regarding the selection,

retention and funding of investments and investment or money managers

and advisors as well as the brokerage firms that administered OBWC's

investment portfolio

It has never been satisfactorily explained to the Court why the Ohio Bureau of Workers'

Compensation engaged in an action which resulted in amassing the sum of $19 billion, the

investment of which became the source of the corruption.  During the trial of United States v.

Lewis and O'Neil, Case No. 1:06 CR 291, the Court heard testimony that in at least one year, the

annual premiums paid by the employers for workers' compensation coverage was sufficient to

13

(1:06 CR 269)

pay both the cost of operating the Ohio Bureau of Workers' Compensation and to pay existing benefits to injured workers.  Against that background, the accumulation of $19 billion for investment purposes provided multiple opportunities for corrupt activity.  It is not surprising that such corrupt activity ensued and for which this defendant finds himself now subject to criminal sanctions.  The prosecutions undertaken by the United States Government have, as its underlying purpose, to prevent in the future corrupt activity as revealed in this and the other criminal cases.  The eventual shame to which the defendants, such as this defendant, Clarke Blizzard, and others are subject, arguably constitutes punishment in or of itself.  However, additional criminal sanctions must be imposed in the hope that other persons with similar educational and employment opportunities will be persuaded in the future from engaging in similar corrupt activity.

In sum, it is obvious that the defendant's conduct was serious, that an appropriate sentence is necessary to promote respect for the law and to provide just punishment for his criminal conduct.  White collar criminal conduct is serious and, in this setting, undermines public confidence in such important agencies as the Ohio Bureau of Workers' Compensation and those unfortunate employees who suffer job-related injuries and are entitled to compensation.

The defendant's conduct also undermines the confidence of the employers who are required to pay workers' compensation premiums.

### (B)  to afford adequate deterrence to criminal conduct;

The basis for most white collar criminal conduct is greed, not necessity.  Against the background of human nature, it is the Court's view, that other persons, well educated and

14

(1:06 CR 269)

enjoying a comfortable lifestyle, will still engage in criminal conduct such as on display in this case.  The Court is of the belief that a sentence to a period of 64 months will provide adequate deterrence, but certainly not a guarantee that similar criminal conduct by others will not happen in the future.

### (C)  to protect the public from further crimes of the defendant;

The defendant is 60.  He has and will continue to suffer shame and humiliation for his conduct.  After the defendant has served confinement for a period of 64 months, the Court is of the view that this particular defendant will not engage in further crimes.

### (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

The defendant is well educated and does not need further educational or vocational training.  The defendant's medical condition, as described herein, indicates that will need ongoing structured medical care while incarcerated.  It is possible that the defendant's talents will be put to use in the prison setting where he may provide instruction on a variety of topics that will assist less fortunate inmates when they return to civilian life and attempt to find meaningful employment.

15

(1:06 CR 269)

<u>Conclusion</u>

For the reasons set forth herein, a sentence of 64 months with supervised release for three years and within the advisory guideline range, is a sentence sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2).

IT IS SO ORDERED.

 May 9, 2007                              */s/ David D. Dowd, Jr.*
Date                                      David D. Dowd, Jr.
                                          U.S. District Judge

16